UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                    :
IN RE ARBCO CAPITAL MANAGEMENT,       :
LLP,                                                :
                            Debtor,        :              11 Civ. 6586 (JPO)
                                                    :
-------------------------------------------------------------X              MEMORANDUM AND
                                                    :                    ORDER
PENSON FINANCIAL SERVICES, INC.,        :
                            Movant,        :
                                                    :
                                                    :
                -v-                                :
                                                    :
RICHARD O'CONNELL, as Chapter 7 Trustee  of:
the estate of Arbco Capital Management, LLP      :
                            Respondent.   :
------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

    Penson Financial Services ("Penson") moves, pursuant to 28 U.S.C. § 157(d), Rule

5011(a) of the Federal Rules of Bankruptcy Procedure, and Rule 5011-1 of the Local Bankruptcy

Rules for the Southern District of New York, to withdraw the reference of this proceeding from

the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court")

to the United States District Court for the Southern District of New York ("District Court").

    For the reasons set forth below, the motion to withdraw the reference is denied.

I.      **Background**[1]

    Prior to its involuntary bankruptcy, Arbco Capital Management, LLP ("Arbco"), an

investment firm, operated ostensibly to invest money for its clients.  In June 2009, Arbco's then-

---

[1] The following facts are drawn from the parties' pleadings and other submissions and are undisputed unless
otherwise noted.

president, Hayim Regensberg, was convicted of seven counts of wire and securities fraud in connection with a Ponzi scheme orchestrated to defraud investors. Regensberg is currently serving a 100-month prison sentence.

Regensberg's investors filed an involuntary Chapter 7 bankruptcy proceeding against Arbco in the Bankuptcy Court in October 2007. *See* Arbco Capital Management, LLP in Bankruptcy Case No. 07-13283 (SCC). Richard O'Connell (the "Trustee") was appointed as Chapter 7 Trustee of Arbco's estate to investigate Arbco's financial affairs and to attempt to recover monies for distribution to creditors.

Penson, a Texas-based clearing firm, cleared and settled Arbco's trades prior to Arbco's involuntary bankruptcy. On October 15, 2009, the Trustee initiated the instant adversary proceeding against Penson in the Bankruptcy Court. In his complaint, the Trustee alleges that Mr. Regensberg used monies invested in Arbco to engage in highly speculative option and margin trading through Penson. In the two years prior to the filing of its involuntary bankruptcy, Arbco made 37 cash transfers to Penson totaling $10,927,500, which the Trustee now seeks to recover for the bankruptcy estate.

On February 22, 2010, Penson moved to dismiss the Trustee's complaint as factually insufficient. The Bankruptcy Court held a hearing on October 14, 2010, and directed the Trustee to amend the complaint to include more specific factual allegations concerning Penson's role in enabling Regensberg to maintain his Ponzi scheme. The Trustee filed his amended complaint on January 18, 2011.

In the amended complaint, the Trustee asserts seven causes of action against Penson:

1) Intentional fraud under Bankruptcy Code § 548(a)(1)(A);

2) Constructive fraud under Bankruptcy Code § 548(a)(1)(B);

2

3)   Voidable preference under Bankruptcy Code § 547;

4)   Aiding and abetting fraud in violation of securities law;

5)   Common law breach of fiduciary duty;

6)   Breach of contract; and

7)   Negligence.

Penson moved in the Bankruptcy Court to dismiss the amended complaint on March 18, 2011.

During an August 4, 2011 conference before the Bankruptcy Court, Judge Shelley Chapman discussed the pending motion to dismiss[2] and the impact of the Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), decided on June 23, 2011.  (*See* Hearing Transcript; Declaration of Mark G. Hanchet ("Hanchet Decl.), Dkt. No. 4, ¶ 7.)  Penson informed the Bankruptcy Court that it was considering filing a motion to withdraw the bankruptcy reference in light of *Stern*.  The Bankruptcy Court instructed the parties to confer regarding *Stern*'s implications and that, if no agreement could be reached, Penson should notify the Bankruptcy Court as to whether it intended to move to withdraw the reference.  (*Id.*)  On September 6, 2011, Penson notified the Bankruptcy Court that it intended to move to withdraw the reference.  (*Id.* at ¶ 8.)  Penson filed the instant motion to withdraw the reference in this Court on September 20, 2011.

## II.    Jurisdiction and Adjudicative Power of the Bankruptcy Court

District courts have original jurisdiction over bankruptcy cases and all civil proceedings "arising under" or "related to" cases under Title 11.  28 U.S.C. § 1334.  Pursuant to 28 U.S.C. §

---

[2] Judge Chapman gave the parties her initial views on the pending motion to dismiss, stating, "I still think there's enough here that something's going to survive a motion to dismiss. . . ."  (Transcript from August 4, 2011 hearing before the Bankruptcy Court, Ex. B to Ancone Decl., Dkt. No. 5-2, p. 12:18-20.)

157(a), the district court may refer actions within its bankruptcy jurisdiction to the bankruptcy

judges of the district.  The Southern District of New York has a standing order that provides for

automatic reference of bankruptcy cases to the Bankruptcy Court.  *See In re Standing Order of*

*Reference Re: Title 11,* 12 Misc. 32 (S.D.N.Y. Feb. 1, 2012) ("Standing Order").  The Standing

Order was recently amended on February 1, 2012 to make clear that the Bankruptcy Court

retains jurisdiction to hear matters related to the bankruptcy proceedings and to issue proposed

findings of fact and conclusions of law when the Bankruptcy Court lacks constitutional authority

to enter a final judgment.  *Id.*[3]

Notwithstanding the initial automatic reference, a "district court may withdraw, in whole

or in part, any case or proceeding referred [to the Bankruptcy Court] under this section, on its

own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d).  Prior to

*Stern*, the Second Circuit's decision in *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir.

1993), provided guidance as to whether "cause" for withdrawal of the reference exists.  Under

the test formulated in *Orion*, a district court must "first evaluate whether the claim is core or non-

---

[3] The Standing Order bridges the apparent statutory gap that followed from *Stern*'s holding that bankruptcy courts
lacked the authority to enter final judgment on certain core proceedings:  some courts post-*Stern* have questioned
whether bankruptcy courts have the authority to propose findings of fact and conclusions of law with respect to
these core matters.  *See, e.g.*, *In re Blixseth*, Adv. No. 10–00088, 2011 WL 3274042, at *12 (Bankr. D. Mont. Aug.1,
2011) (requiring parties to move to withdraw the reference after concluding that 28 U.S.C. § 157(c)(1) provided
authority to render findings of fact and conclusions of law only for non-core proceedings).  As revised, the Standing
Order in Southern District provides:

> If a bankruptcy judge or district judge determines that entry of a final order or
> judgment by a bankruptcy judge would not be consistent with Article III of the
> United States Constitution in a particular proceeding referred under this order
> and determined to be a core matter, the bankruptcy judge shall, unless otherwise
> ordered by the district court, hear the proceeding and submit proposed findings
> of fact and conclusions of law to the district court.  The district court may treat
> any order of the bankruptcy court as proposed findings of fact and conclusions
> of law in the event the district court concludes that the bankruptcy judge could
> not have entered a final order or judgment consistent with Article III of the
> United States Constitution.

core." *Id.*  Pursuant to 28 U.S.C. § 157, the bankruptcy court has authority to "hear and determine" core matters, but must issue "proposed findings of fact and conclusions of law to the district court" with respect to non-core matters.  *Id.* at 1100-01.  Next, under the *Orion* test, the district court must consider whether the claim is "legal or equitable," followed by "considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law."  *Id*. at 1101.  No single factor is dispositive.

Post-*Stern*, the withdrawal analysis may differ.  The Supreme Court's decision in *Stern* at least calls into question the utility of the first prong of the *Orion* test:  the determination of whether the matter is core.

Congress codified the "core" and "non-core" categories in the Bankruptcy Amendments and Federal Judgeship Act of 1984, 28 U.S.C. § 157 (the "1984 Act"), in the wake of another Supreme Court decision, *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co*., 458 U.S. 50 (1982) (plurality opinion).  In *Northern Pipeline*, as in *Stern*, the Supreme Court examined the contours of Article III of the U.S. Constitution.

Article III provides:

> The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behaviour, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

U.S. Const. art. III § 1.  Pursuant to Article III, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty."  *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855).  Bankruptcy courts, in contrast to Article III courts, are established by Congress pursuant

5

to its power under Article I of the Constitution, to exercise jurisdiction over matters arising under

bankruptcy laws.  U.S. Const. art. I § 8; *see generally Northern Pipeline*, 458 U.S. at 63-64;

*Collins v. Foreman*, 729 F.2d 108, 113 (2d Cir. 1984).

In *Northern Pipeline*, the Supreme Court considered whether it was constitutional for

Congress to establish bankruptcy courts, as legislative courts, to exercise jurisdiction over

matters arising under bankruptcy laws.  A majority of the Supreme Court held that it was

unconstitutional for the bankruptcy court to enter a final judgment adjudicating state-law contract

claims against a party who was not otherwise a part of the bankruptcy proceeding.  *Northern*

*Pipeline*, 458 U.S. at 88; *see also id.* at 92 (Rehnquist, J., concurring in judgment).  While the

plurality in *Northern Pipeline* recognized that there existed an imprecisely defined category of

rights—"public rights" (discussed in section III(A)(2) *infra*)—that Congress could

constitutionally assign for resolution to non-Article III courts, *id.* at 67-70, the majority in

*Northern Pipeline* held that any public rights exception did not encompass adjudication by a

bankruptcy court of the state-law claim at issue in that case, *id.* at 71-72; *see also id.* at 91

(Rehnquist, J., concurring in judgment).

In response to *Northern Pipeline*, Congress enacted the 1984 Act, which revised the

statutes governing the bankruptcy courts.  The 1984 Act empowers bankruptcy courts to hear,

determine, and enter final judgment on core matters, including for example "matters concerning

the administration of the estate," "counterclaims by the estate against persons filing claims

against the estate," "proceedings to determine, avoid, or recover preferences," and "proceedings

to determine, avoid, or recover fraudulent conveyances."  28 U.S.C. § 157(b)(1)(A), (B), (F),

(H).  With respect to non-core matters, the 1984 Act requires "any final order or judgment [to] be

entered by the district judge after considering the bankruptcy judge's proposed findings and

6

conclusions and after reviewing de novo those matters to which any party has timely and

specifically objected."  28 U.S.C. § 157(c)(1).  Thus, prior to *Stern,* it was widely understood

that, pursuant to the 1984 Act, the Bankruptcy Court had the authority to finally resolve core

matters, while it lacked such authority with respect to non-core matters.

        In *Stern*, the Supreme Court made clear that the 1984 Act "failed to remedy all the

constitutional infirmities identified in *Northern Pipeline*."  *In re Extended Stay, Inc.*, 466 B.R.

188, 199 (S.D.N.Y. 2011).  In *Stern*, Vickie Lynn Marshall (also known as Anna Nicole Smith,

now deceased) ("Vickie") filed a counterclaim in bankruptcy court against Pierce Marshall (the

son of her late husband, J. Howard Marshall II, both now deceased) ("Pierce") for tortious

interference with a gift that she had expected from Pierce's father.  131 S. Ct. at 2601.  Pierce,

who had initially filed a claim for defamation against Vickie in Vickie's bankruptcy court

proceeding, challenged the bankruptcy court's constitutional authority to adjudicate Vickie's

tortious interference counterclaim against him.[4]  In a significant decision, the Supreme Court

held that 28 U.S.C. § 157(b) indeed authorized the bankruptcy court to issue a final judgment on

Vickie's tortious interference counterclaim, but that such authorization was unconstitutionally

conferred.  *Id.*  ("We conclude that, although the Bankruptcy Court had the statutory authority to

enter judgment on Vickie's state law counterclaim, it lacked the constitutional authority to do

so.").  The *Stern* Court concluded that Congress had improperly vested judicial power in a non-

Article III tribunal when it authorized bankruptcy courts to "enter a final judgment on a state law

_____

[4] The Supreme Court held that Pierce, who had advised the bankruptcy court that he was "'happy to litigate [his] claim' there," had consented to the bankruptcy court's adjudication of the defamation claim.  *Stern*, 131 S. Ct. at 2607 (citations omitted) (alterations in original).  "Given Pierce's course of conduct before the Bankruptcy Court, we conclude that he consented to the court's resolution of his defamation claim (and forfeited any argument to the contrary)."  *Id.* at 2608.

counterclaim that is not resolved in the process of ruling on a creditor's proof on claim." *Id.* at 2620.

      As part of the Article III analysis, the *Stern* Court stressed the importance of judicial independence and judicial power.  "The colonists had been subjected to judicial abuses at the hand of the Crown," in large part "because the King of Great Britain 'made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.'" *Id.* at 2609 (quoting The Declaration of Independence ¶ 11).  "In establishing the system of divided power in the Constitution, the Framers considered it essential that 'the judiciary remain[] truly distinct from both the legislature and the executive.'" *Id.* at 2608 (alteration in original) (quoting The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton)).  To safeguard against outside influence and judicial corruption, Article III ensures that federal judges' tenure and salary are insulated from the outcome of any case.  Bankruptcy judges, in contrast to Article III judges, are protected by neither lifetime tenure nor a guarantee that their salaries will not be diminished.  Thus, a bankruptcy judge may not exercise the judicial power of the United States as described in Article III of the Constitution.  *See, e.g.*, *Northern Pipeline*, 458 U.S. at 89. "Article III . . . could neither serve its purpose in the system of checks and balances nor preserve the integrity of the judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III."  *In re Quigley Co., Inc.*, 676 F.3d 45, 52 (2d  Cir. 2012) (quoting *Stern*, 131 S. Ct. at 2609) (internal quotation marks omitted).

      In *dicta*, the *Stern* Court characterized its holding as "narrow" and declared that its decision does not "meaningfully change[] the division of labor" between bankruptcy courts and district courts.  *Stern*, 131 S. Ct. at 2620.  However, following *Stern*, that a matter is designated

"core" to the underlying bankruptcy proceeding no longer signifies that a bankruptcy court may constitutionally render final judgment with respect to that matter.  *Id.*; *see also, e.g.*, *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 464 (S.D.N.Y. 2011) ("[I]dentifying a claim as 'core' or 'non-core' under the bankruptcy law does not necessarily determine whether a bankruptcy court is constitutionally empowered to finally adjudicate the matter.").

The implications of *Stern*'s reasoning are arguably in tension with its language impliedly limiting the decision's impact on the current bankruptcy regime.  Attempting to resolve the tension, some courts in this district have limited *Stern*'s holding to the "unique set of facts" of the *Stern* case.  *In re Extended Stay, Inc.*, 466 B.R. at 199.  The Bankruptcy Court is constitutionally barred from finally adjudicating a claim, notwithstanding its designation as core, if "(1) the counterclaim would not be resolved by adjudication of the creditor's proof of claim; (2) the counterclaim was 'not completely dependent upon adjudication of a claim created by federal law'; and (3) the creditor 'did not truly consent' to resolution in bankruptcy court."  *Id.* (citing *Stern*, 131 S. Ct. at 2608, 2617, 2614) (footnotes omitted); *see also Adelphia Recovery Trust v. FLP Group, Inc*., No. 11 Civ. 6847 (PAC), 2012 WL 264180, at *2 (S.D.N.Y. Jan. 30, 2012); *Dev. Specialists, Inc.*, 462 B.R. at 467 ("[A]fter *Stern*, th[e] power [of the Bankruptcy Court to enter final adjudications] depends, not on whether the matters are core or non-core, but on whether the rights being adjudicated (1) are public rights, or (2) will necessarily be resolved in ruling on a creditor's proof of claim—or, of course, on the parties unanimously consenting to bankruptcy court adjudication.").

### III.    The *Orion* Test After the *Stern* Decision

After *Stern*, the relevance of the first prong of the old *Orion* test—whether a matter is core or non-core—is not obvious.  Determining that a matter is core is certainly no longer tantamount to a determination that the bankruptcy court has the power to finally resolve it.  This Court concludes, as have others in this district, that the relevant inquiry under the first prong of the *Orion* test is not whether a matter is core or non-core, but whether the bankruptcy court has the authority to finally adjudicate the matter.  *See, e.g.*, *In re Lyondell Chemical Co.*, 467 B.R. 712, 719 (S.D.N.Y. 2012) ("After *Stern*, the core/non-core distinction may or may not remain relevant to a district court's withdrawal of the reference 'for cause.'"); *Dev. Specialists, Inc.*, 462 B.R. at 467 ("[A]fter *Stern*, one can still apply [] *Orion* factors but not looking at whether the matter can be classified as 'core' under 28 U.S.C. § 157, but rather at whether, under *Stern*, the Bankruptcy Court has the final power to adjudicate it.").  *But see In re Extended Stay, Inc.*, 466 B.R. at 204 ("[T]here is nothing in *Stern* to suggest that the statutory distinction between core and non-core claims is an inappropriate consideration when analyzing permissive withdrawal under section 157(d).").  In other words, in evaluating a motion to withdraw, the district court should look beyond whether a matter is classified as core or non-core under 28 U.S.C. § 157 to whether the Bankruptcy Court has final adjudicative authority over the matter.

Accordingly, the Court considers below each of the factors identified in *Orion*, but in light of *Stern*, treats the first prong as an inquiry into the bankruptcy court's final adjudicative authority.  In analyzing whether the bankruptcy court may constitutionally enter a final judgment, in turn, the Court considers the three factors emphasized in *Stern*:  1) whether the defendant filed a proof of claim in the bankruptcy proceeding, 2) whether the right is public or private, and 3) whether the parties consented to have the bankruptcy court enter final judgment.

### A.      Final adjudicative authority

In the present motion, Penson argues that all of the claims asserted against it—1) claims to avoid and recover fraudulent conveyances, 2) claims for insider preferences, and 3) the four state common law claims (aiding and abetting a fraud, breach of fiduciary duty, breach of contract, and negligence)—are matters of private right that cannot be finally adjudicated by the Bankruptcy Court.  The Trustee takes the position that the Bankruptcy Court has the power to enter a final judgment on the claims in this action because they are core proceedings, because they arise out of the same transaction as core proceedings, or because Penson has impliedly consented to the jurisdiction of the Bankruptcy Court.

Claims based on alleged fraudulent conveyances are classified as core pursuant to the Bankruptcy Code.  28 U.S.C. § 157(b)(2)(H).  Similarly, claims based on preferential transfers are classified as core by 28 U.S.C. § 157(b)(2)(F).  The state-law claims are non-core.  However, classification of these claims as core or non-core is not dispositive of the motion for withdrawal of the reference and, as discussed above, in light of *Stern*, can no longer be considered dispositive of whether the Bankruptcy Court has final adjudicative authority.

### 1.      Proof of Claim

A creditor may subject itself to the binding authority of the bankruptcy court by filing a proof of claim against the bankrupt estate.  *See, e.g.*, *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990) ("[B]y filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power."); *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 59 n.14 ("By presenting their claims respondents subjected themselves to all the consequences that attach to an

appearance . . . .") (quoting *Katchen v. Landy*, 382 U.S. 323, 335 (1966) (internal quotation marks omitted)); *see also Stern*, 131 S. Ct. at 2616.

Penson does not seek recovery from Arbco's estate, nor has it filed a proof of claim in the underlying bankruptcy action.  (Declaration of Mark Curraro, Dkt. No. 3.)  Accordingly, this factor counsels against drawing a conclusion that the Bankruptcy Court may enter a final judgment.

2.      **Public or Private right**

The next step in determining whether the Bankruptcy Court may enter a final judgment is to determine whether the claims at issue—1) fraudulent conveyance, 2) preferential transfer, and 3) state common law claims—are matters of public or private right.  The public rights exception, in certain instances, permits a non-Article III court to adjudicate matters that would otherwise be within the purview of Article III courts.  The public rights doctrine, first formulated in *Murray's Lessee v. Hoboken Land & Improvement Co.*, originally granted non-Article III courts the power to adjudicate some disputes between an individual and the government.  59 U.S. at 283-84 (holding that it was not an exercise of judicial power for the Treasury Department to sell property belonging to a customs collector who had failed to transfer certain payments to the Federal Government).  Since then, the public rights exception doctrine has materialized in Supreme Court jurisprudence in various incarnations.  *See, e.g.*, *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 593-94 (1985) (Congress "may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary."); *see also Stern*, 131 S. Ct. at 2611 ("[O]ur discussion of the public rights exception . . . has not been entirely consistent, and the exception has been the subject of some debate . . . .").  Most recently

12

the Supreme Court concluded that the public rights exception is limited to "cases in which the

claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an

expert government agency is deemed essential to a limited regulatory objective within the

agency's authority. *Stern*, 131 S. Ct. at 2613. A "public right," as opposed to a "private right,"

is "integrally related to particular federal government action." *Id.* (citations omitted).

### a.    Fraudulent Conveyance

The Trustee argues that since fraudulent conveyance claims are core proceedings, the

Bankruptcy Court retains authority to enter final orders. The Trustee relies on two cases to argue

that the holding in *Stern* is narrow. *See In re Heller Ehrman, LLP*, Bankr. No. 08–32514DM,

2011 WL 4542512, at *6 (Bankr. N.D. Cal. Sept. 28, 2011) ("After *Stern*, some courts have

concluded that they cannot hear fraudulent conveyance claims as core proceedings. They are

focusing on the *dicta* of *Stern*, not its holding."); *In re Safety Harbor Resort and Spa*, 456 B.R.

703, 717 (Bankr. M.D. Fla. 2011) ("[T]his Court is not aware of a single case during the twenty

years preceding *Stern* challenging a bankruptcy court's authority to enter final judgments in

fraudulent conveyance actions.").

However, the Trustee's argument ignores *Stern*'s conclusion that the bankruptcy court

can enter final judgment only on those claims that fall within the public rights exception,

regardless of their statutory designation as core. The Supreme Court has indicated that

fraudulent conveyance claims do not fall within the public rights exception. *See Granfianciera*,

492 U.S. at 55-56. In *Granfinanciera*, the Court held:

> There can be little doubt that fraudulent conveyance actions by
> bankruptcy trustees—suits which . . . constitute no part of the
> proceedings in bankruptcy but concern controversies arising out of
> it—are quintessentially suits at common law that more nearly
> resemble state-law contract claims brought by a bankrupt

13

> corporation to augment the bankruptcy estate than they do
> creditors' hierarchically ordered claims to a pro rata share of the
> bankruptcy res. They therefore appear matters of private rather
> than public right.

*Id.* at 56 (internal citations and marks omitted). Indeed, in reaching its conclusions in *Stern*, the Supreme Court specifically relied on *Granfinanciera*'s characterization of fraudulent conveyance actions as private rights where the creditor had filed no proof of claim: "Vickie's counterclaim—like the fraudulent conveyance claim at issue in *Granfinanciera*—does not fall within any of the varied formulations of the public rights exception in this Court's cases." *Stern*, 131 S. Ct. at 2614; *see also In re Lyondell Chemical Co.*, 467 B.R. at 720 ("Under both *Stern* and *Granfinanciera*, then, it is axiomatic that a fraudulent conveyance claim against a person who has not submitted a claim against a bankruptcy estate, brought solely to augment the bankruptcy estate, is a matter of private right.").

Moreover, as the *Stern* Court emphasized, "*Granfinanciera*'s distinction between actions that seek 'to augment the bankruptcy estate' and those that seek 'a pro rata share of the bankruptcy res,' reaffirms that Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 131 S. Ct. at 2618. Here the fraudulent conveyance claims indisputably stem from the Trustee's attempt to "augment the bankruptcy estate," although the Trustee correctly notes that their disposition will have some impact on the funds available for distribution to Arbco's creditors. *See, e.g., Kirschner v. Agoglia*, No. 11 Civ. 8250, __ F. Supp. 2d __, 2012 WL 1622496, at *4 (S.D.N.Y. May 9, 2012) ("These claims for fraudulent conveyance under New York statutory law are claims that seek to augment the bankruptcy estate—the very type of claim

14

that . . . must be decided by an Article III court."  (alteration in original) (internal citations

omitted)).  Moreover, as Penson has filed no proof of claim, the claims against it will not be

resolved in the context of ruling on the proofs of claim submitted by Arbco's creditors.

Thus, it is clear that the fraudulent conveyance claims involve private rights and that

under the logic of *Stern*, barring consent of the parties, an Article III court must enter the final

judgment on such claims.

### b.  Preferential Transfers

The Court similarly concludes that claims for avoidance of preferential transfers, where

the creditor has filed no proof of claim, are not subject to the public right exception.  The Trustee

relies on the classification of preference actions as core proceedings under the Bankruptcy Code,

28 U.S.C. § 157(b)(2)(F), to argue that the Bankruptcy Court retains the authority to enter a final

judgment.[5]  On the other hand, Penson argues that the Bankruptcy Court lacks final

decisionmaking authority:  since it filed no proof of claim, the preference action will have no

impact on the core claims process, will not be decided in Arbco's claims allowance process, and,

if successful, will only augment the bankruptcy estate.

"A voidable preference claim asserts that a debtor made a payment to a particular [party]

in anticipation of bankruptcy, to in effect increase that [party]'s proportionate share of the

estate."  *Stern*, 131 S. Ct. at 2616.  Avoidance of the preference allows the Trustee to recapture

any share received by the preference defendant that is more than the equitable share to which he

_____

[5] The Trustee also argues that preference actions do not exist at common law, but rather only in the context of the
Bankruptcy Code.  *See Stern*, 131 S. Ct. at 2618 (in bringing a preference action, plaintiff "was asserting a right of
recovery created by federal bankruptcy law").  While it is true that actions to avoid preference are created by the
Bankruptcy Code, fraudulent conveyance claims, which as discussed above are matters of private right, also derive
from the Bankruptcy Code.  The test is not whether a cause of action arises from the Code, but whether it is within
the public rights exception.

or she is entitled under the Bankruptcy Code.  Preferential transfers thus are payments for

legitimate debts, and their recovery is in furtherance of a more equitable distribution among

creditors.  *See In re Apex Long Term Acute Care–Katy, L.P.*, 465 B.R. 452, 463 (Bankr.S.D.Tex.

2011).[6]

 While the Supreme Court has not expressly held that actions to avoid preferential

transfers are matters of private right, the Supreme Court has examined the authority of the

bankruptcy court to adjudicate preferential transfer claims in the Seventh Amendment context

and determined that preference defendants are entitled to a trial by jury.  While the Seventh

Amendment of the Constitution guarantees the right to a jury for most civil suits, absent consent

of the parties, the bankruptcy court may not conduct a jury trial.  *See* 28 U.S.C. § 157(e) ("If the

right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy

judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such

jurisdiction by the district court and with the express consent of all the parties.").  In *Schoenthal

v. Irving Trust Co.*, the Supreme Court concluded that the defendant in an action to recover

preferential payments brought against it in equity, who never consented to have the action tried

in equity, was entitled to have the action transferred to a court at law and to a trial by jury.  287

U.S. 92, 94-95 (1932) ("Suits to recover preferences constitute no part of the proceedings in

bankruptcy but concern controversies arising out of it.").  In *Langenkamp v. Culp*, the Supreme

Court similarly affirmed that a preference defendant had a right to a jury trial, where the

_____

[6] "The entire purpose of the cause of action, then, is to enforce the Bankruptcy Code's equality of distribution.  In this respect, preferential transfer actions are fundamentally different from fraudulent transfer actions, although the two causes of action superficially resemble. . . .  Fraudulent transfer actions are not necessarily asserted against entities that were ever legitimate creditors of the debtor.  Preferential transfer actions, in contrast, are part of the administration of the estate: they are concerned with determining the amounts of claims under the Bankruptcy Code."  *Apex*, 465 B.R. at 463.

defendant had not filed a proof of claim against the bankruptcy estate. 498 U.S. at 45 ("If a party does *not* submit a claim against the bankruptcy estate, . . . the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances the preference defendant is entitled to a jury trial.").

*Granfinaciera* makes clear that the analysis with respect to a defendant's right under the Seventh Amendment to a jury trial translates to the Article III context: "the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal." 492 U.S. at 53. Since a preference defendant is entitled to a jury trial before an Article III court where it has not filed a proof of claim against the bankruptcy estate, it follows that the preference defendant is entitled to have its claim finally adjudicated by an Article III judge.

*Stern*'s *dicta* similarly support the conclusion that where a creditor has not submitted a proof of claim, preference actions may be finally adjudicated only by an Article III court. "[A] preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because *then* 'the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.'" *Stern*, 131 S. Ct. at 2616 (alteration in original) (quoting *Langenkamp*, 498 U.S. at 44).[7] Moreover, where the preference defendant has not filed a proof of claim against the estate, the Trustee's action against it more closely resembles an action to 'augment the bankruptcy estate' than an action related to the distribution

---

[7] A preference defendant may submit a claim up to thirty days after an adverse decision. Fed. R. Bankr. P. 3002(c)(3) ("An unsecured claim which . . . becomes allowable as a result of a judgment may be filed within 30 days after the judgment becomes final if the judgment . . . avoids the entity's interest in property.") This does not alter the conclusion that an Article III court must finally adjudicate the preferential transfer claim absent the parties' consent where a preference defendant has not yet submitted a proof of claim.

of the bankruptcy *res*.  Accordingly, this Court concludes that preferential transfer claims, where, as here, the preference defendant has filed no proof of claim against the bankruptcy estate, are matters of private right.

### c.    State Common Law Claims

The Trustee argues that the state-law causes of action arise out of the same transactions as the fraudulent conveyance and preferential transfer claims, potentially making them core as well and subject to the bankruptcy court's final adjudicative authority.  To the contrary, these state-law causes of action involve non-core proceedings and are indisputably private rights.

### 3.    Consent

Finally, the Trustee argues that Penson has consented to the Bankruptcy Court's jurisdiction to enter final judgment, even with respect to non-core matters.  The Trustee argues that the failure to raise jurisdiction in a timely manner "can only be construed as implied consent."  *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1138 (2d Cir. 1987).  The Trustee emphasizes that Penson has participated in two "hearings" before the Bankruptcy Court without raising any objection to its jurisdiction.

The Bankruptcy Code, as amended in 1987, however, requires "express consent of the parties" for a bankruptcy judge to enter final orders and judgments in non-core matters.  Fed. R. Bankr. P. 7012(b); *see also In re Lyondell Chemical Co.*, 467 B.R. at 722 (holding that the court should not infer consent where defendants seek withdrawal at the close of discovery and "where new precedent renders unclear the authority of the bankruptcy [court] to enter final judgment on certain claims.").  Furthermore, "present law seems to mandate that parties must expressly consent to the entry of a final order by the bankruptcy court in the determination of non-core matters."  *Bennett v. Genoa AG Cntr., Inc. (In re Bennett)*, 154 B.R. 126, 140 (Bankr. N.D.N.Y.

1992); *Dev. Specialists, Inc.*, 462 B.R. at 467 (rejecting argument that movant impliedly consented to Bankruptcy Court adjudication because there was not a "knowing and voluntary relinquishment of rights to an Article III decision-maker," especially pre-*Stern* (internal quotation marks omitted)).

This Court does not find that Penson expressly consented to adjudication of these matters by the Bankruptcy Court or knowingly waived its rights to have these claims adjudicated by an Article III court, especially when the matter is considered in light of the timing of the *Stern* decision, which was unanticipated prior to June 23, 2011.

Accordingly, because 1) Penson has filed no proof of claim, 2) the fraudulent conveyance, preferential transfer, and state law claims at issue involve private rights, and 3) the parties have not consented to final judgment by the Bankruptcy Court, this Court concludes that the Bankruptcy Court lacks final authority to adjudicate these claims and that final judgment must be entered by an Article III court.

**B.     Other *Orion* Factors**

The Court next considers the remaining *Orion* factors and concludes that they weigh in favor of maintaining the reference to the Bankruptcy Court at present.

**1.     Legal or Equitable**

It is well established that a non-Article III court lacks the power to conduct a jury trial on an Article III right without the consent of the parties.  28 U.S.C. 157(e).  As Penson has not waived its right to a jury trial or consented to a jury trial in the Bankruptcy Court, Penson is entitled to a jury trial before an Article III court, if the proceedings progress to that stage.

Nevertheless, the reference can be withdrawn at a later date if a jury trial is to take place. It is possible that these claims may be resolved before the matter is ripe for a trial before a jury.

19

"Indeed, withdrawing the reference is premature where discovery has not commenced and plaintiffs have not yet survived a motion to dismiss." *In re Extended Stay, Inc.*, 466 B.R. at 206. The parties may move to withdraw the reference again should the matter progress to trial.

### 2.        Considerations of Efficiency

Penson argues that judicial economy counsels withdrawing the reference now so that the claims can be adjudicated and disposed of in one proceeding.  Penson suggests that this will promote efficient use of judicial resources, avoid delay, and minimize costs related to litigating in two fora.  The Trustee counters that it would be more efficient to proceed before the Bankruptcy Court because it has some familiarity with this matter and has already reviewed both motions to dismiss.

This Court agrees that judicial efficiency favors keeping this proceeding in Bankruptcy Court for pretrial purposes.  Delaying withdrawal of the reference will provide this Court with the benefit of the Bankruptcy Court's expertise and familiarity with the background of this matter, as well as similar bankruptcy matters.  The Court also rejects the argument that the Magistrate Judge is better equipped to manage discovery in this matter than the Bankruptcy Court, which handles similar claims regularly.  This Court will undoubtedly benefit from the proposed findings of fact and conclusions of law submitted by the Bankruptcy Court.

### 3.        Prevention of Forum Shopping

The Trustee argues that the delay in filing the motion to withdraw the reference, and the filing of it while the motion to dismiss is still pending, suggest forum shopping.  Penson denies that it is forum shopping and maintains that it moved to withdraw the reference at the earliest opportunity in light of the holding in *Stern*.

20

It is true that the Bankruptcy Judge has discussed her preliminary impressions of the pending motion to dismiss, and it is not inconceivable that Penson's motion is partially motivated by a desire to avoid an adverse ruling on its motion.  But this Court cannot conclude that forum shopping, rather than the change in the law, was the principal impetus for the current motion.

####    4.        Uniformity in the Administration of Bankruptcy Law

Penson argues that withdrawing the reference would not hamper uniform administration of the Bankruptcy Code because the Bankruptcy Court does not have the authority to enter final judgment on these claims.  Even though the Bankruptcy Court lacks such final authority, the Court finds that uniformity in the administration of the bankruptcy law still favors allowing the Bankruptcy Court the opportunity to consider and evaluate these claims in the first instance.

#### IV.    Conclusion

For the foregoing reasons, the motion to withdraw the reference is DENIED without prejudice to any renewed motions to withdraw when the case is ready for trial.

The Clerk of Court is directed to close the motion at docket number 1 and to remand this matter to the bankruptcy court.

SO ORDERED.

Dated: New York, New York
       July 12, 2012

J. PAUL OETKEN
United States District Judge

21